KENTUCKY OFF–TRACK BETTING, INC., Appellant,

v.

James McBURNEY, Appellee.

No. 98–SC–454–DG.

Supreme Court of Kentucky.

June 17, 1999.

P. Douglas Barr, T. Christopher Daniel Stoll, Keenon & Park, LLP, Lexington, for appellant.

Darrell L. Saunders, Corbin, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a decision of the Court of Appeals which reversed and remanded a summary judgment on behalf of Kentucky Off-Track Betting, Inc., for default of a promissory note made in connection with a series of checks which McBurney wrote to cover gambling debts.

The questions presented are whether the execution of a promissory note was a void transaction pursuant to KRS 372.010 and unenforceable; whether there is a conflict between KRS 372.010, KRS 230.215 and KRS 230.380 and whether the argument has been properly preserved for appellate review.

Late in 1994 and early in 1995, Corbin resident McBurney, sole owner of Waitsboro Fiberglass Boat Manufacturing Company, made substantial unsuccessful bets on horse races at KOTB's Corbin facility, writing a series of checks. McBurney lost many bets and by March 1995, was indebted to KOTB for $389,781.74. McBurney wrote KOTB various personal checks drawn on his bank as evidence of his promise to pay, but because he did not have sufficient funds in the bank to honor the checks, KOTB agreed not to cash them.

On March 16, 1995, KOTB manager Gene McClain asked McBurney about honoring the checks. McBurney told him that the bank account was insufficient to pay for the checks. McClain then asked McBurney to execute a promissory note in the principal amount of $389,781.74 in exchange for the checks, which McBurney did. McBurney paid twelve installments totaling $84,000 through June of 1995, but discontinued payments thereafter. KOTB brought a civil action to collect the outstanding balance on the note.

KOTB emphasizes the legality of the transactions pursuant to the 1992 legislation specifically authorizing off-track betting facilities on simulcast horse racing. It also claims that such specific and recent legislation expresses the public policy of the General Assembly and KRS 230 should control over the older general prohibiting language of KRS 372.010. In effect, it argues that the statute prohibiting the lending of money for wagering has been repealed by implication.

On the other hand, McBurney contends that KRS 372.010 is clearly the law and makes the transaction void and unenforceable. KRS 372.010 provides as follows:

Every contract, conveyance, transfer or assurance for the consideration, in whole or in part, of money, property or other thing won, lost or bet in any game, sport, pastime or wager, or for the consideration of money, property or other thing lent or advanced for the purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then purpose of gaming, or lent or advanced at the time of any betting, gaming, or wagering to a person then actually engaged in betting, gaming, or wagering, is void.

The trial judge granted KOTB summary judgment but the Court of Appeals reversed, holding that even though the bet is a legal bet, a debt coming within the provisions of KRS 372.010 is void and unenforceable. We accepted discretionary review.

I

▉ KOTB argues that McBurney in his circuit court and Court of Appeals arguments characterized his promissory note as a "contract for the consideration of money lost or bet by a person actually engaged in betting," and has improperly changed his argument by embracing in his reply brief in the Court of Appeals the "lent or advanced" language in 372.010. McBurney's reply brief in the Court of Appeals further cited for the first time

*McDevitt v. Thomas*, 130 Ky. 805, 114 S.W. 273 (1908), a telegram wagering case upon which the Court of Appeals panel primarily relied in reversing the summary judgment for KOTB.

Citing the relevant statute at issue was sufficient in this case to alert the trial court to the fact that McBurney was claiming the execution of the promissory note to be a void transaction under KRS 372.010. KOTB's interpretation of *McDevitt, supra,* requiring that the statute must be analyzed in three distinct sections, is erroneous. *McDevitt* simply stated that, "For convenience this act may be divided into three sections." *McDevitt* at 274.

In addition to *McDevitt*, the Court of Appeals cited with approval, *Dobbs v. Holder,* Ky., 242 S.W.2d 605 (1951), in which this Court stated in part that a check or other evidence of indebtedness based upon a gambling consideration is absolutely void and the obligor is not bound to even an innocent holder of the instrument. The court also stated that it is well settled that when a statute expressly declares the instrument void, it gathers no vitality by its circulation with respect to the party executing it. Similarly, *George Alexander & Co. v. Hazelrigg*, 123 Ky. 677, 97 S.W. 353 (1906), stated that a bill or note based on a gambling consideration is absolutely void and the drawer or maker is not bound even to an innocent holder.

As the Court of Appeals observed, the cases relied on are pre-Uniform Commercial Code, and it is therefore necessary to consider if the result would be any different under the code. We recognize the treatise authored by Leibson and Nowka, *The Uniform Commercial Code of Kentucky*, Negotiable Instruments § 4.4B (2d Ed.1992), which states that the result of *Dobbs, supra,* would be identical because KRS 372.010, the local law on the matter, remains unchanged.

We must agree with the Court of Appeals that based on KRS 372.010, *McDevitt, Dobbs* and *Hazelrigg, supra,* that the checks that McBurney wrote to KOTB, the promissory note executed in favor of KOTB, as well as any verbal assurances to pay were void and unenforceable. By accepting checks that it knew to be worthless in exchange for bets while McBurney was actually engaged in betting and by continuing to allow him to place more bets thereafter, KOTB clearly entered into a gambling transaction declared void by the plain language of KRS 372.010.

## II

KOTB asks for review of the law in this area from the perspective of our current societal public policy. It points out that in the past decade an amendment to Section 226 of the Kentucky Constitution permits first, a state lottery, and then charitable gaming, with 1992 statutory additions and amendments to KRS 230 not only encouraging betting on horse racing at simulcast facilities pursuant to KRS 230.380, but also permits wagering not limited to cash, telephone accounts and credit cards, pursuant to KRS 230.379.

KRS 230.215 is intended to encourage the horse breeding industry through the allowance of parimutuel wagering subject to regulation by the Kentucky Racing Commission. KRS 230.380 authorizes parimutuel betting at certain simulcast facilities, called off-track betting facilities. The plain language of these statutes indicates that they do not impact the activities prohibited by KRS 372.010. The real issue presented here is whether one may collect money loaned or advanced to a person to bet while that person is actually engaged in betting.

The 1992 General Assembly simply intended to acknowledge the various technological advances of modern times, such as satellites and television when it legalized off-track betting for the benefit of businesses engaged in accepting bets on horse races by licensed facilities. It is now no longer necessary to physically go to a race track to place a bet. The promotion of the horse racing industry and the establish-

ment of simulcast facilities is clearly independent of the issue of advancing money for the purposes of gambling.

The loaning of money or advancing of credit to a person by a betting facility which is itself a party to the gambling transaction is the type of unacceptable social conduct that the General Assembly intended to prevent when it adopted KRS 372.010, and which we must presume the General Assembly chose not to repeal when it legalized off-track betting. Betting is legal, the lending of money by a betting facility in order to bet is not.

### III

KOTB also argues that KRS 220.215 and 230.380 are in conflict with KRS 372.010 and that consequently we must use statutory construction in such a situation. KOTB contends that the conflict in statutes should be resolved by repealing KRS 372.010 by implication. There is only a need to use the rules of statutory construction if the statutes actually conflict. There is no direct conflict between the statutes in question, rather the statutes are not mutually exclusive and pursuant to our obligation to harmonize the law, we find that there is no conflict.

It is a well-settled rule of statutory construction that the repeal of an existing law by implication is not favored by the courts, and a legislative enactment will not be interpreted as repealing by implication a prior statute unless the repugnancy is so clear as to admit no other reasonable construction. *Cf. Tipton v. Brown,* 277 Ky. 625, 126 S.W.2d 1067 (1939), cited in *Preston v. Floyd/Johnson County Pilots,* Ky.App., 867 S.W.2d 474 (1993). *See also Holcomb v. Mayes,* Ky., 290 S.W.2d 486 (1956). Courts will presume that where the legislature intended a subsequent act to repeal a former one, it will so express itself so as to leave no doubt as to its purpose. *Tipton, supra,* quoting *Oldham County v. Arvin,* 251 Ky. 317, 64 S.W.2d 907 (1933).

As noted in *Hardaway Management Co. v. Southerland,* Ky., 977 S.W.2d 910 (1998), it is a maxim of statutory construction that repeal by implication is not favored and will not be upheld, unless such intention clearly appears or unless the repugnancy is so clear as to admit no other reasonable construction. *City of Eddyville v. City of Kuttawa.* Ky., 343 S.W.2d 404 (1961). The citations supporting the fact that repeal by implication is not favored are so numerous that they are unnecessary to repeat here.

In addition, *Commonwealth v. International Harvester Co.,* 131 Ky. 551, 115 S.W. 703 (1909), states that the first duty of a court when required to construe statutes is to harmonize them if possible so as to allow both to stand unless there is an obvious inconsistency or an ambiguity exists. We find no legal inconsistencies or ambiguity.

Here there is no direct conflict between KRS 372.010 and KRS 230.215 and 230.380. The statutes in question address different issues and there is no basis for this Court to find that the legislature implicitly repealed KRS 372.010 simply because off-track betting is legal.

The decision of the Court of Appeals is affirmed and this matter is remanded to the circuit court for a judgment consistent with this opinion.

LAMBERT, C.J., COOPER, GRAVES, KELLER and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., dissents with a separate opinion in which Stumbo, J., joins.

JOHNSTONE, Justice, dissenting.

I respectfully dissent from the majority opinion. The purpose of KRS 372.010 is to prevent *illegal* gambling by rendering void and unenforceable the gambling contract itself and certain related agreements. In *McDevitt v. Thomas,* 130 Ky. 805, 114 S.W. 273 (1908), this Court held that "[t]he

purpose of [KRS 372.010] is to discourage betting or wagering by declaring all contracts relative thereto void, and by this means lessen what is generally regarded as a social evil." Although KRS 372.010 remains on the books, the "social evil" discouraged in the first decade of this century is viewed in a different context in the last decade of this century. For example, in the past decade, amendments to the Kentucky Constitution have permitted a state lottery and charitable gaming. Statutory additions and amendments in 1992 legalized pari-mutuel wagering on horse racing at simulcast facilities per KRS 230.380. Further, use of credit cards for betting via telephone lines and credit card cash advances via automated teller machines have been authorized. The social evil that KRS 372.010 was designed to curb was gambling, an *illegal activity* at the time of the statute's enactment, not money lent for a *legal activity*. It is preposterous that while it is legal to place a pari-mutuel wager on a horse race at an authorized facility, and it is legal to loan money, it is illegal to loan money to someone to place a legal wager on a horse race in this Commonwealth.

Further, in today's society a check presented is equivalent with cash. By accepting a personal check as payment for goods and services, KOTB did not make a loan to McBurney. KOTB accepted McBurney's personal check as a payment in good faith, believing that the checks would be honored when presented to the financial institution. Only after McBurney approached KOTB to inform it that the checks would not be honored due to insufficient funds, did McBurney intimate that he would enter into a promissory agreement to pay more than $350,000 to cover the bad checks. It is likely that McBurney entered into this agreement to avoid prosecution for writing the bad checks.

There is no evidence in the record that KOTB made any agreement to loan or advance money, or even advance credit "at the time of any betting, gaming, or wager-ing" to McBurney who was then engaging in betting. The majority opinion presumes, although not supported by the record, that the parties agreed to loan contemporaneously, with McBurney placing his ill-fated, but legal bets.

For the foregoing reasons, I respectfully dissent.

STUMBO, J., joins this dissent.